STEPHEN TIMOTHY BYRD AND SANDRA SAIN BYRD, PETITIONERS FOR THE ADOPTION OF RACHEL LEIGH BYRD

No. COA99-887

(Filed 2 May 2000)

**1. Adoption— consent—alleged father—acknowledgment requirement**

Respondent natural father's consent to the adoption of his child was not required in a case where respondent conditioned his acceptance of responsibility for the child on a determination that he was the child's biological father, because: (1) N.C.G.S. § 48-3-601 requires an alleged father to have acknowledged his paternity of the minor before the earlier of the filing of the adoption petition or the date of the hearing; (2) respondent's offer to provide the biological mother with a place to live during her pregnancy, along with his obtaining various jobs during the biological mother's pregnancy, fall short of the requirements to show he acknowledged the paternity of the unborn child; and (3) N.C.G.S. § 48-3-601 does not allow a potential father's acknowledgment of his paternity to be conditioned on establishing a biological link with the child.

**2. Adoption— consent—alleged father—support requirement**

The evidence was sufficient to support the trial court's findings that respondent natural father failed to provide the support required under N.C.G.S. § 48-3-601, thus negating the requirement of his consent prior to the adoption of his child, because: (1) testimonial evidence in the record showed that respondent earned money above his living expenses during the biological mother's pregnancy, and respondent did not give any money to the biological mother; (2) there are no exceptions for the consistent and reasonable support requirement, meaning respondent's obligation is not conditioned on either the biological mother's acceptance of a place to live as support, or sufficient time between the

**IN RE ADOPTION OF BYRD**

[137 N.C. App. 623 (2000)]

child's birth and the filing of the petition to allow the man time to provide support for the child; and (3) the potential father's support obligation cannot be conditioned on establishing a biological link with the child.

Judge HUNTER dissenting.

Appeal by Respondent Michael Thomas Gilmartin from order entered 10 February 1999 by Judge Fred M. Morelock in District Court, Wake County. Heard in the Court of Appeals 24 February 2000.

*Manning, Fulton & Skinner, P.A., by Howard E. Manning and Michael S. Harrell, for the petitioners-appellees.*

*H. Spencer Barrow and George B. Currin for the respondent Michael Thomas Gilmartin.*

WYNN, Judge.

Under N.C. Gen. Stat. § 48-3-601, the consent of a man who may or may not be the father of a child must be obtained in an adoption proceeding except where the potential father failed to acknowledge his paternity or provide support for the biological mother and the child. N.C.G.S. § 48-3-601(2)(b)(4)(II) (1999). In this case, the potential father contends that his level of acknowledgment and support provided for an unborn child should be considered in light of the biological mother's uncertainty of his paternity. Because the potential father neither adequately acknowledged paternity nor provided the financial support required under N.C.G.S. § 48-3-601(2)(b)(4)(II), we must affirm the trial court's holding that his consent was not required in the adoption proceeding of the child.

The facts of this case culminate in an emotional confrontation of families regarding the status of a minor child. In September 1997 eighteen-year-old Shelly Dawn O'Donnell informed seventeen-year-old Michael Thomas Gilmartin[1] of her pregnancy and revealed that the date of birth derived from an ultrasound indicated that he fathered her child. But a later ultrasound indicated a different due date which in turn indicated that Michael may not have fathered her child.

Shelly decided to give her child up for adoption. Working through an adoption network, she developed a relationship with Steve Byrd

1. Michael currently serves in the United States Coast Guard.

and his wife Sandra who desired to adopt her child. Shelly contacted Michael to request his consent to the private placement adoption; however, he refused stating that he wanted his baby.

To resolve this difference, Shelly petitioned the District Court in Chowan County to make a "Prebirth Determination of Right" stating that there "is more than one possible biological father" and requesting the court to determine whether "the consent of Respondent Michael Gilmartin [was] required for the adoption of . . . the child." Shelly served that petition upon Michael along with a notice stating:

> You have been identified as one of the possible biological fathers. It is the intention of the biological mother to place the child up for adoption. It is her belief that your consent to the adoption is not required. If you believe your consent to the adoption of this child is required pursuant to G.S. 48-3-601, you must notify the court in writing no later than 15 days from the date you received this notice that you believe your consent is required.

Indeed, Michael responded stating:

> 5. . . . the respondent contends that his consent to adopt is required and believes that he possibly is the biological father of the child. That the petitioner repeatedly told the respondent that he was the biological father of the said child. That the respondent is desirous of having custody of the said child placed with him if it is determined that he is the biological father.
>
> . . .
>
> 8. That the [respondent] is desirous of assisting with the medical expenses incurred regarding the birth of the child, as well as being interested in paying child support for the care and maintenance of the child, should he be determined to be the child's father.

In short, Michael requested that "no adoption of the said child be approved by the [c]ourt until it is determined that [he] is not the biological father of the said child."

About a month later, on 4 March 1998, Shelly gave birth to a baby girl. The next day, unbeknownst to Michael, the Byrds filed a Petition for Adoption in the District Court in Wake County. On the same day, unbeknownst to the Byrds, Michael filed a complaint and petition in the District Court in Chowan County. In his complaint, Michael

IN RE ADOPTION OF BYRD

[137 N.C. App. 623 (2000)]

requested: (1) the court to order a blood test to determine parentage of the baby, (2) all other proceedings in the cause be stayed until the test results were available and (3) custody should be granted in his favor or in the alternative, visitation rights be granted if he was determined to be the father of the child. The District Court in Chowan County, however, denied his motion for a blood test in April 1998.

In the interim, Michael received service of the Byrds' adoption petition and responded by requesting custody or visitation with the child "should it be determined by blood test, that he is the natural father of said minor child." On 28 July 1998, Michael moved for a blood test under N.C. Gen. Stat. § 8-50.1 in the District Court in Wake County. The trial court granted his motion; and, the resulting test showed a probability of 99.99% that Michael fathered the child.

Notwithstanding the results of the blood test, at an adoption hearing in October 1998, the trial court concluded that Michael's consent was not required under N.C. Gen. Stat. § 48-3-601 because before filing the adoption petition Michael failed to: (1) acknowledge the child and (2) provide "in accordance with his financial means, reasonable and consistent payments for the support of the biological mother during or after the term of pregnancy, or the support of the minor or both."

From this order, the respondent—Michael Thomas Gilmartin—appeals.

I.

[1] The respondent first contends that his consent to the adoption was required under N.C.G.S. § 48-3-601 because he adequately complied with the statute's acknowledgment requirement. We must disagree.

Under N.C.G.S. § 48-3-601, a petition to adopt may be granted only if consent to the adoption has been executed by:

b. Any man who may or may not be the biological father of the minor. . . .

N.C.G.S. § 48-3-601(2)(b).

But that statute also requires that before "the earlier of the filing of the petition or the date of the hearing," the man must have "acknowledged his paternity of the minor." N.C.G.S. § 48-3-601(2)(b)(4).

**IN RE ADOPTION OF BYRD**

[137 N.C. App. 623 (2000)]

In construing statutes, such as N.C.G.S. § 48-3-601, our primary task is to determine the legislative intent. *See Turlington v. McLeod*, 323 N.C. 591, 594, 374 S.E.2d 394, 396 (1988). To ascertain this legislative intent "resort must first be had to the language used." *Nance v. Southern Ry. Co.*, 149 N.C. 366, 371, 63 S.E. 116, 118 (1908). "In other words, the statute must, if possible, be made to speak for itself." *Id.* Therefore, where "the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must give it plain and definite meaning." *Williams v. Williams*, 299 N.C. 174, 180, 261 S.E.2d 849, 854 (1980).

Under the plain language of N.C.G.S. § 48-3-601, to assert the right to consent to an adoption, an alleged father must first acknowledge his paternity of the child before the earlier of the filing of the adoption petition or the date of the hearing. *See* N.C.G.S. § 48-3-601(2)(b)(4). The term "acknowledgment" for purposes of paternity actions means "the recognition of a parental relation, either by written agreement, verbal declarations or statements, by the life, acts and conduct of the parties, or any other satisfactory evidence that the relation was recognized and admitted." *Carpenter v. Tony E. Hawley, Contractors*, 53 N.C. App. 715, 720, 281 S.E.2d. 783, 786 (1981).

In this case, the biological mother revealed that during her child's conception period, she engaged in sexual relations with more than one man including the respondent. She revealed her uncertainty of the paternity of her child to the respondent. Nonetheless, to preserve his consent rights for adoption, N.C.G.S. § 48-3-601(2)(b)(4) required the respondent to "acknowledge" the unborn child as his own.

The respondent asserts that the following actions were sufficient to constitute acknowledgment of his paternity: (1) offering to provide the biological mother with a place to live during her pregnancy, (2) obtaining various jobs to provide support for the child, and (3) filing several court documents requesting custody of the child upon a determination that he was the child's biological father.

Indeed, the record on appeal shows that the respondent offered the biological mother a place to live during her pregnancy. The record also shows that the respondent attempted various jobs during the biological mother's pregnancy. But those actions fall short of the requirements under our case law to show that he acknowledged the paternity of the unborn child.

**IN RE ADOPTION OF BYRD**

[137 N.C. App. 623 (2000)]

In essence, the respondent argues that it was reasonable for him to condition his acknowledgment or acceptance of responsibility for the child on a determination that he was the child's biological father. Yet, N.C.G.S. § 48-3-601 does not allow a potential father's acknowledgment of his paternity to be conditioned on establishing a biological link with the child. In fact, that statute removes any requirement of a biological link by stating that "any man who *may or may not* be the biological father of the minor." N.C.G.S. § 48-3-601 (emphasis supplied).

We recognize that under a plain reading of the statute, the respondent faced a difficult dilemma—to acknowledge paternity of a child that he may not have fathered, or face the possibility that the child would be adopted by third parties without his consent. However, his equitable challenge must yield to our judicial stricture to follow the statutory law, not make it. When the constitutionally affirmed laws of the General Assembly provide unambiguous language, we must follow it even though the facts of a particular case may cry out for fairness, or a different result. And in instances where the General Assembly plainly speaks, we must infer that under its policy-making authority it understood the consequences of its enactment. Thus, where an unambiguous law of the legislature presents a situation that appeals for a different result, our restrained role as jurists empowers us only to point out this anomaly. So, that in light of that circumstance, the legislature may be moved to further reflect on its words to determine if in fact they intended such a result.[2]

The statute in this case, N.C.G.S. § 48-3-601, plainly and unambiguously requires a man who "may or may not" be the biological father, to acknowledge paternity to preserve the right to consent to an adoption of that child. Because the evidence in the record supports a finding that the respondent did not acknowledge his paternity

---

2. The dissenting opinion states: "To require a man, who has been informed by the biological mother that he 'may or may not be' the biological father, to acknowledge that he *is* the father, not only goes against the plain reading of N.C. Gen. Stat. § 48-3-601, but also against logic." While we can agree that such an outcome appears illogical, our role as jurists is not to challenge with our own logic the plain words of the legislature under N.C. Gen. Stat. § 48-3-601 which explicitly states that it applies to any man who *may or may not be the biological father of the minor.* The dissent also suggests that any man who has been so informed, need only acknowledge that he may or may not be the father. Nonetheless, the unambiguous language of N.C. Gen. Stat. § 48-3-601 requires the man to have "acknowledged his paternity of the minor." To read in an amendment that the father be allowed to acknowledge that he may or may not be the father of the child would be to rewrite N.C. Gen. Stat. § 48-3-601. That's a legislative function, not a judicial function.

of the child, we must conclude that the trial court properly determined that his consent to the child's adoption was not required.

## II.

**[2]** A second reason supporting the trial court's determination that the respondent's consent was not required for the adoption is that he failed to provide the support required under N.C.G.S. § 48-3-601. The respondent contends that he (1) provided support in accordance with his financial means, and (2) was not required to comply with the statute's support requirement.

N.C.G.S. § 48-3-601 provides that to preserve consent rights for adoption, a man who may or may not be the father of the child, must have provided in accordance with his financial means,

> reasonable and consistent payments for the support of the biological mother during or after the term of pregnancy, or the support of the minor or both. . . ."

N.C.G.S. § 48-3-601(2)(b)(4)(II).

In this case, the trial court made the following findings of fact regarding the respondent's compliance with N.C.G.S. § 48-3-601's support requirement:

> 14. At no time during September-October, 1997 time period did the respondent provide any financial support to O'Donnell. On one occasion in mid-October, 1997, the respondent and his mother, Patricia Gilmartin took O'Donnell to a local restaurant in Edenton where Patricia Gilmartin offered O'Donnell a free room in Patricia Gilmartin's resident during the term of O'Donnell's pregnancy so that O'Donnell could mitigate certain expenses. O'Donnell refused this offer. O'Donnell afterwards took the respondent and Ms. Gilmartin to the William's home, where respondent and Ms. Gilmartin looked at ultrasound pictures of the baby on the porch of the William's house.

> 15. Around the 1st of November, 1997, the respondent went to Nags Head to secure full-time employment in order to save money for the child. O'Donnell acknowledged that the respondent was working to save money for the child. The respondent worked two different full time jobs (one for several weeks, the other for approximately six weeks) until he returned to his grandparent's residence just before the holidays in December, 1997. The respondent rented an apartment with two other individuals

where he paid $75.00 a week in order to have a bedroom the total rent on the apartment was $650.00 a month. (The respondent could have slept on a sofa and paid rent of $30.00 per week, but he did not) The respondent had $50.00 a week left over after paying all of his expenses for living in Nags Head. During this time period, the respondent did not provide any financial support to O'Donnell.

. . .

19. Upon respondent's return to his grandparents residence in Pea Ridge in late December, 1997, he again began working around his grandparents' residence earning approximately $90.00 per week. He did this through the date of [the child's] birth, March 4, 1998. He was not charged any expense for room, board, or other items during any time when he resided with his grandparents. He did not provide any financial support to O'Donnell from late December 1997 through the date of [the child's] birth, March 4, 1998. The respondent claimed that he did not have much money to send O'Donnell, particularly in light of the fact that "She told me on and off that I was the father."

. . .

25. On the date of [the child's] birth, the respondent purchased a $100.00 money order and some baby clothing and gave the same to his mother to forward to O'Donnell. The money order was not mailed to O'Donnell until March 9, 1998.

Based on these findings of fact, the trial court concluded that the respondent failed to comply with the statute's support requirement.

The respondent argues that the trial court's finding of fact number 15 that he "had $50.00 a week left over after paying all of his expenses for living in Nags Head" was unsupported by the evidence in the record. And he argues that the evidence supports a finding that he did not have the financial means to provide monetary support to the biological mother during her pregnancy.

However, testimonial evidence in the record showed that he had over $50 left over when he worked in Nags Head. In fact, during the adoption hearing the respondent stated that:

Q. Okay Now you've testified that you made—you really saved, at the end of each week, $50 a week—

**IN RE ADOPTION OF BYRD**

[137 N.C. App. 623 (2000)]

A. Around.

Q. —after you had paid your expenses. And you had a checking account and you could have sent it couldn't you? Isn't that right.

A. Yes, but there was a chance—

. . . .

A. Yes, I could have sent it, but there was a chance that would ruin my chances of staying at the beach to work because some weeks it would rain and we wouldn't get a full week in. So I'd have to take that $50 I saved and put toward rent.

While the evidence showing that the respondent earned money above his living expenses appears equivocal, we are bound to uphold the trial court's findings in the face of competence evidence that support those findings. *See Humphries v. City of Jacksonville*, 300 N.C. 186, 187, 265 S.E.2d 189, 190 (1980) (holding that if the trial court's findings of fact are supported by the evidence, they are binding on appeal even though there may be evidence to the contrary). Since the record contains evidence to support the trial court's findings, we must uphold the trial court's determination that the respondent failed to comply with the statute's support requirement.

Still, the respondent argues that he was not required to comply with the statute's support requirement because the circumstances present in this case made it impossible for him to do so. He contends that (1) the biological mother made it "clear that she did not want, nor would she accept, any financial support" from him, and (2) the filing of the adoption petition just one day after the birth of the child prevented him from providing support to the child.

As stated, in construing N.C.G.S. § 48-3-601, we must apply its plain meaning. Under the statute's plain meaning, a man must before the earlier of the filing of the adoption petition or the date of the hearing provide reasonable and consistent payments for the support of (1) the biological mother during her pregnancy, (2) the minor, or (3) both the biological mother and the minor. N.C.G.S. § 48-3-601(b)(4)(II). Reasonable is defined as "[f]air, proper, or moderate under the circumstances . . . ." BLACK'S LAW DICTIONARY 1272 (7th ed. 1999). Consistent means to be "reliable [or] steady." AMERICAN HERITAGE COLLEGE DICTIONARY 297 (3rd ed. 1997).

Significantly, N.C.G.S. § 48-3-601 does not—as the respondent suggests—condition the requirement of consistent and reason-

**IN RE ADOPTION OF BYRD**

[137 N.C. App. 623 (2000)]

able support on either (1) the biological mother's acceptance of a place to live as support, or (2) sufficient time between the child's birth and the filing of the petition to allow the man to provide support for the child.

Again, we are mindful of the respondent's dilemma since there is evidence in the record that the mother, in fact, did refuse the offer to stay with his mother during her pregnancy, and the adoption petition was filed just one day after the child's birth. Nonetheless, the statute makes no exceptions for the support requirement, and we will read no such requirements into the General Assembly's clear language.

We are also mindful that the unanswered question of the child's parentage may have fueled the respondent's reluctance to take more affirmative steps to comply with the statute's support requirement. But N.C.G.S. § 48-3-601 does not allow a potential father's support obligation to be conditioned on establishing a biological link with the child. As with the acknowledgment requirement, the respondent was given the choice under the statute to provide support for a biological mother who was uncertain as to whether he fathered the child, or face the possibility that the child could be adopted by third parties without his consent. Because the evidence in the record supports a finding that the respondent chose not to provide reasonable and consistent support in accordance with his means, we must conclude that the trial court properly determined that his consent to the child's adoption was not required.

The trial court's order is,

Affirmed.

Judge MARTIN concurs.

Judge HUNTER dissents in a separate opinion.

Judge HUNTER dissenting.

I respectfully dissent. As applied to the present case, N.C. Gen. Stat. § 48-3-601 provides in pertinent part that:

[A] petition to adopt a minor may be granted only if consent to the adoption has been executed by:

. . .

b. Any man who *may or may not be the biological father* of the minor but who:

. . .

4. Before the earlier of the filing of the petition or the date of a hearing under G.S. 48-2-206, has *acknowledged* his paternity of the minor and

    I. Is obligated to support the minor under written agreement or by court order;

    II. *Has provided, in accordance with his financial means, reasonable and consistent payments for the support of the biological mother during or after the term of pregnancy,* or the support of the minor, or both, which may include the payment of medical expenses, living expenses, or other tangible means of support, *and* has regularly visited or communicated, or attempted to visit or communicate with the biological mother during or after the term of pregnancy, or with the minor, or with both[.]

N.C. Gen. Stat. § 48-3-601 (1999) (emphasis added). The two issues before this Court are respondent's acknowledgment and support under this statute.

According to *Carpenter v. Tony E. Hawley Contractors,* 53 N.C. App. 715, 281 S.E.2d 783, *disc. review denied,* 304 N.C. 587, 289 S.E.2d 564 (1981),

the word "acknowledged" is not a term of art meaning requiring a formal declaration before an authorized official. In regard to paternity actions, the term "acknowledgment" generally has been held to mean the recognition of a parental relation, either by written agreement, verbal declarations or statements, by the life, acts, and conduct of the parties, or any other satisfactory evidence that the relation was recognized and admitted.

*Id.* at 720, 281 S.E.2d at 786. I believe that the respondent's actions in the present case indicate that he acknowledged the unborn child as required by the statute. It is undisputed that from the time O'Donnell learned she was pregnant in September 1997 until the phone call in November 1997, respondent acknowledged that he was the father of

the unborn child. The trial court found that respondent met with O'Donnell to discuss issues surrounding the pregnancy during this time, and, in October 1997, respondent and his mother met with O'Donnell and offered her housing during her pregnancy, which was refused. Therefore, respondent unquestionably met the acknowledgment requirement up until November 1997. Additionally, after the November 1997 phone call, respondent never denied parentage. Rather, he continued to offer support to O'Donnell and the child, and he acknowledged in court documents that the child may or may not be his and requested custody and offered support of the child if he were found to be the biological father. The trial court made the following findings of fact pertinent to this issue:

16. On or around November 14, 1997, O'Donnell was given a different due date for her child which was approximately two weeks earlier than the due date originally given. This new due date could have meant that O'Donnell's former boyfriend and not the respondent was the biological father of O'Donnell's child. In a telephone conversation on November 14, 1997, O'Donnell informed the respondent about the changed due date. The parties' evidence on this specific phone call differed in that the respondent claimed that O'Donnell told him that he was "not" the father of O'Donnell's baby while petitioners' evidence indicates that O'Donnell told the respondent that he "may not" be the father of her baby. The evidence is insufficient for either side for the court to make a specific finding of fact concerning the exact content of this telephone call.

. . .

22. On January 21, 1998, O'Donnell filed a petition for prebirth determination of right of consent in Chowan County and served the same upon the respondent. The respondent was also served with a notice of petition which included in part:

You have been identified as one of the possible biological fathers. It is the intention of the biological mother to place the child up for adoption. It is her belief that your consent to the adoption is not required. If you believe your consent to the adoption of this child is required pursuant to G.S. 48-3-601, you must notify the court in writing no later than fifteen (15) days from the date you received this notice that you believe your consent is required.

**IN RE ADOPTION OF BYRD**

[137 N.C. App. 623 (2000)]

The respondent was served with a copy of this petition and notice, and on February 2, 1998, he timely filed a response which stated in part:

> . . . [T]he respondent contends that his consent to adopt is required and believes that he possibly is the biological father of the child. That the petitioner repeatedly told the respondent that he was the biological father of the said child. That the respondent is desirous of having custody of the said child placed with him if it is determined that he is the biological father.

The respondent's response went on to state:

> That the defendant is desirous of assisting with the medical expenses incurred regarding the birth of the child, as well as being interested in paying child support for the care and maintenance of the child, should he be determined to be the father.
>
> . . .
>
> 23. In February, 1998, the respondent telephoned O'Donnell three times . . . . Each time, the respondent inquired as to the progress of O'Donnell's pregnancy and O'Donnell's well-being. Each time, O'Donnell requested that the respondent sign the papers to allow the adoption to go forward, which the respondent refused to do. O'Donnell told the respondent that she would not notify him when the child was born, as she would be "busy."

On the same day petitioners filed the request for adoption of the child, respondent filed a complaint asking that parentage be determined, and if he was the biological father, that he be granted custody and that the support obligations of O'Donnell and respondent be determined by the court.

The majority holds that respondent did not acknowledge that he was the child's father, and makes no differentiation as to his actions before and after November 1997. As I have stated, it is undisputed that respondent acknowledged the child as his until the 14 November 1997 phone call by O'Donnell that questioned his parentage. To require a man, who has been informed by the biological mother that he "may or may not be" the biological father, to acknowledge that he *is* the father, not only goes against a plain reading of N.C. Gen. Stat.

§ 48-3-601, but also goes against logic. Therefore, I believe that when the biological mother has informed a putative father that he may or may not be the father of her child, he is only required under N.C. Gen. Stat. § 48-3-601 to acknowledge just that, *i.e.*, that he may or may not be the father. Competent evidence indicates that the respondent in the present case did so. Accordingly, I believe that respondent met the acknowledgment requirement of this statute both before and after November 1997.

As to the issue of having provided support of the biological mother and/or child during or after the term of pregnancy, I believe the following findings of fact by the trial court, which were not cited by the majority, are instructive:

10. After O'Donnell and respondent's relationship ceased in early June, the respondent had no employment until early November, 1997 as noted below, other than continuing to work around his grandparents' house approximately three days a week and making $80-$90 per week. The respondent was involved in an automobile accident in August, 1997 which incapacitated him approximately one month. . . .

. . .

13. In September and October, 1997 O'Donnell went to see the respondent approximately once a week at the respondent's grandparents' home in Pea Ridge to discuss various issues with him, including issues concerning O'Donnell's pregnancy. On one occasion, O'Donnell spent the night at respondent's grandparents' residence. . . .

. . .

17. In late November—early December 1997 . . . O'Donnell contacted respondent and requested that he consent to the private placement adoption. Respondent refused to consent to the adoption and advised O'Donnell that he still wanted to raise the child.

. . .

24. On March 4, 1998, O'Donnell gave birth to Rachel. The respondent through his mother found out about the birth, and he went to Chowan County Hospital once on March 4 and once on March 5 while O'Donnell was in the hospital to see O'Donnell and/or Rachel, but he was informed by the

hospital administrators that he was not on O'Donnell's approved list for visitors . . . .

25. On the date of Rachel's birth, the respondent purchased a $100.00 money order and some baby clothing and gave the same to his mother to forward to O'Donnell. This money order and clothing was not mailed to O'Donnell until March 9, 1998.

Based on these findings, and those cited by the majority, I believe that competent evidence indicates that the respondent provided support to O'Donnell in accordance with his financial means. O'Donnell stayed at respondent's grandparents' home on at least one occasion. As the majority recognizes, respondent and his mother offered the biological mother housing throughout her pregnancy, and she refused. The majority points out that respondent had $50.00 left over after covering his living expenses from November to December 1997 and infers that this money should have been paid to O'Donnell; however, the trial court found that O'Donnell acknowledged that respondent was working to "save" money for the child. While the court did not specifically find that respondent saved money for the child, I believe that his working to save money for the child qualifies as providing support for the unborn child in light of his financial means. Such action would not be illogical, or in violation of N.C. Gen. Stat. § 48-3-601, when the putative father has been told that he may very well not be the biological father of the unborn child. Apparently, the respondent had saved money for the child's support, as the trial court found that respondent purchased a $100.00 money order for the child on the day of its birth. From December 1997 to the time of the child's birth, respondent only made $90.00 a week doing work around his grandparents' residence. While the court found that he had no room or board expenses, it did not find nor conclude that respondent had extra money with which to support O'Donnell. The trial court found that respondent and O'Donnell had a volatile relationship after O'Donnell asked respondent to give his consent to the unborn child's adoption. O'Donnell barely acknowledged respondent during this period. On the day the child was born, respondent was not even allowed to see the child or O'Donnell. The day after the birth, respondent filed suit requesting that parentage be determined, and asked for custody if he were the father, in which case he also indicated his intent to support the child.

I believe that competent evidence indicates that respondent's support was *provided* in accordance with his financial means.

DIALYSIS CARE OF N.C., LLC v. N.C. DEP'T OF HEALTH & HUMAN SERVS.

[137 N.C. App. 638 (2000)]

Respondent offered housing to O'Donnell during the pregnancy, which was refused, worked to save money for the child, and purchased a $100.00 money order for the child on the day of the child's birth. The fact that the mother refused support does not negate the fact that respondent provided it, by the only means within his power, in accordance with the statute. Therefore, I would hold that respondent met the support requirements under N.C. Gen. Stat. § 48-3-601.

Our General Assembly has specifically declared its legislative policy as to the purpose of the adoption statutes. N.C. Gen. Stat. § 48-1-100 states in pertinent part:

(1) The primary purpose of this Chapter is to advance the welfare of minors by (i) protecting minors from unnecessary separation from their original parents, . . . .

N.C. Gen. Stat. § 48-1-100(b)(1) (1999). In light of this being the first primary purpose listed in N.C. Gen. Stat. § 48-1-100, our courts should be extremely cautious in determining that the consent of a biological father to the adoption of his child is not required. Accordingly, I believe that respondent's consent to the adoption of the minor child is necessary, and would reverse the order of the trial court.