STEPHEN TIMOTHY BYRD and SANDRA SAIN BYRD, PETITIONERS FOR THE ADOPTION OF RACHEL LEIGH BYRD

No. 250A00

(Filed 5 October 2001)

**Adoption— consent of putative father—conditioning acknowledgment and support on proof of biological paternity**

The consent of a putative father is not required under N.C.G.S. § 48-3-601(b)(2)(4)(II) before an adoption may proceed when the putative father has conditioned his acknowledgment of fatherhood and support of mother and child upon proof of biological paternity, because: (1) the statute requires the putative father to satisfy three requirements, including that he must have acknowledged paternity, made reasonable and consistent sup-

**IN RE ADOPTION OF BYRD**

[354 N.C. 188 (2001)]

port payments for the mother or child or both in accordance with his financial means, and regularly communicated or attempted to communicate with the mother and child; and (2) even though defendant acknowledged paternity of the minor child prior to the filing of the adoption petition until faced with the news from the mother that another man actually may be the biological father, he failed to consistently provide the kind of tangible support required under the statute and support paid or offered by a third party on a parent's behalf does not relieve that parent from his or her own support obligations.

Justice BUTTERFIELD concurring in part and dissenting in part.

Justice WAINWRIGHT joins in opinion concurring in part and dissenting in part.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 137 N.C. App. 623, 529 S.E.2d 465 (2000), affirming an order signed 10 February 1999 by Morelock, J., in District Court, Wake County. Heard in the Supreme Court 12 February 2001.

*Manning, Fulton & Skinner, P.A., by Howard E. Manning and Michael S. Harrell, for petitioner-appellees Stephen and Sandra Byrd.*

*H. Spencer Barrow and George B. Currin for respondent-appellant Michael Thomas Gilmartin.*

*Rik Lovett & Associates, by James F. Lovett, Jr., on behalf of the North Carolina Family Policy Council, amicus curiae.*

LAKE, Chief Justice.

The question presented for review in this case is whether the consent of a putative father must be obtained before an adoption may proceed when the putative father has conditioned his acknowledgment of fatherhood and support of mother and child upon proof of biological paternity. The Court of Appeals held that the putative father's consent was not required under the circumstances of the case. *In re Adoption of Byrd*, 137 N.C. App. 623, 632, 529 S.E.2d 465, 471 (2000). For the reasons set forth below, we uphold this result.

The circumstances of this case as they developed presented a most difficult situation for the parties involved, as they do now for

this Court. Respondent Michael Thomas Gilmartin had a relationship with Shelly Dawn O'Donnell from April to June 1997. O'Donnell was then eighteen years old and was a high school senior. Respondent was seventeen years old and was a high school dropout. During this period, the couple engaged in unprotected sexual intercourse. O'Donnell also engaged in sexual relationships with three other men either shortly before, during or after her relationship with respondent.

On 22 September 1997, after enrolling at Chowan College in Murfreesboro, North Carolina, O'Donnell learned that she was pregnant. She informed respondent that he was the father based upon her then-perceived due date and period of conception. During September and October of 1997, O'Donnell and respondent frequently saw each other and discussed the pregnancy. Respondent told O'Donnell that he would help support and raise the child.

O'Donnell had suffered an unfortunate family situation. Her father, mother and brother had all passed away. Since their deaths, she had lived with her grandparents until starting college. When O'Donnell revealed her pregnancy to her grandparents, they refused to continue allowing her to live with them. O'Donnell moved into the home of Terry and Jane Williams. Terry Williams was O'Donnell's pastor.

In October 1997, O'Donnell met with respondent and his mother, Patricia Gilmartin. Respondent's mother offered O'Donnell a place to live during the pregnancy, as well as assistance with medical bills and living expenses. O'Donnell declined the offer.

Respondent lived with his uncle and later with his grandparents in Pea Ridge, North Carolina. Respondent worked for his grandfather doing odd jobs until November 1997, earning approximately $80 to $90 per week. In November 1997, respondent moved to Nags Head, North Carolina, to work in construction in an effort to earn and save money for the care of O'Donnell and the expected child. Respondent, however, did not save any money, and in early December of that year respondent left Nags Head and returned to live with his grandparents and complete his general equivalency diploma.

While respondent was working in Nags Head, O'Donnell consulted with a different physician on 14 November 1997, and received a revised due date for her child approximately two weeks earlier than the first date. This revised due date apparently indicated to O'Donnell

that her former boyfriend also could have been the child's father. She then advised respondent that he might not be the biological father of her child. Upon this revelation, respondent became upset and questioned O'Donnell regarding her sexual history, since she had repeatedly told him that he was the biological father of her child. Following this turn of events, O'Donnell and respondent had only brief encounters with each other until the child's birth.

In late November or early December 1997, O'Donnell decided to place her expected child for private adoption. Using the adoption facilitator, Christian Adoption Network, she met petitioners Stephen and Sandra Byrd in December 1997. Respondent was unaware of O'Donnell's intentions until he received a letter from an attorney on 31 December 1997, requesting that he relinquish his parental rights so that the child could be placed for adoption. Respondent refused this request.

On 21 January 1998, O'Donnell filed a petition for prebirth determination of right to consent to the adoption in Chowan County, pursuant to N.C.G.S. § 48-2-206, stating her intentions to place the child for adoption and naming respondent as one of the possible biological fathers. On 2 February 1998, respondent filed his response to the petition, stating that his consent to the adoption was required. Respondent asserted that he wanted custody of the child and that he would provide assistance if he was determined to be the biological father. Respondent also requested that the adoption not be approved until it was determined if he was the biological father.

On 4 March 1998, O'Donnell gave birth to Rachel Briann O'Donnell at the Chowan County Hospital in Edenton, North Carolina. Respondent attempted to visit mother and daughter in the hospital but was prevented from doing so pursuant to O'Donnell's instructions. That same day, respondent purchased a money order for $100 for O'Donnell. The next day, respondent again attempted to visit mother and child at the hospital but was advised that they had been discharged. Respondent's mother mailed the money order and some baby clothes to O'Donnell four days after petitioners filed their adoption petition.

Petitioners filed the adoption petition on 5 March 1998, in Wake County, along with an affidavit of parentage wherein O'Donnell named respondent and another man as possible biological fathers. Pursuant to N.C.G.S. § 48-2-301(a), the Wake County Clerk of Superior Court waived the requirement of placement of the child with

**IN RE ADOPTION OF BYRD**

[354 N.C. 188 (2001)]

the prospective adoptive parents. Petitioners took physical custody of the child on 22 March 1998 and have had exclusive physical custody of the child since that time.

Also on 5 March 1998, respondent filed a complaint seeking custody of the child in Chowan County District Court, conditioned upon the determination that he was the biological father. Respondent also moved for a blood test to determine parentage, and he requested that his complaint for custody and offer of support be summarily dismissed if he was determined not to be the child's biological father.

On 2 April 1998, O'Donnell filed a notice of voluntary dismissal of the prebirth determination of right to consent in Chowan County, and petitioners proceeded with their petition for adoption in Wake County District Court. On 13 April 1998, respondent filed a response to the adoption petition in Wake County District Court, again requesting custody of the child if it was determined by blood tests that he was the biological father. O'Donnell opposed the blood test requested by respondent in Chowan County District Court, and that court subsequently denied the request without prejudice after a hearing on 23 April 1998. Respondent filed a writ of mandamus in the Court of Appeals seeking to compel the test, which the court denied.

On 15 July 1998, petitioners filed a motion for summary judgment in Wake County District Court, requesting the court to dismiss all of respondent's claims. Respondent filed an affidavit in opposition to the motion and a motion for blood tests pursuant to the provisions of N.C.G.S. § 8-50.1(b1). On 13 August 1998, the court denied the motion for summary judgment and granted the request for a blood test. On 21 September 1998, the test results revealed a 99.99% probability that respondent is the child's biological father.

The petition for adoption was heard at the 26-27 October 1998 Civil Session of Wake County District Court, Domestic Division, Judge Fred M. Morelock presiding. The court made findings of fact and concluded that respondent's consent to petitioners' adoption was not required pursuant to N.C.G.S. § 48-3-601(2)(b)(4)(II). The Court of Appeals, with a dissent, affirmed the trial court's order. *In re Adoption of Byrd*, 137 N.C. App. 623, 529 S.E.2d 465.

In the instant case, the only issue on appeal by way of the dissent below is whether respondent's consent must be obtained before the adoption may proceed. Respondent contends that the Court of Appeals erred by affirming the trial court's ruling that his consent to

**IN RE ADOPTION OF BYRD**

[354 N.C. 188 (2001)]

the adoption was not required because he failed to acknowledge paternity and provide reasonable and consistent support to the biological mother or child within his financial means prior to the filing of the petition for adoption. Under N.C.G.S. § 48-3-601, respondent must acknowledge paternity of the minor child and, in accordance with his financial means, provide reasonable and consistent support payments in order to require his consent to the adoption. The only provision of chapter 48 of the General Statutes that applies and relates to the circumstances of this case is N.C.G.S. § 48-3-601 ("Persons whose consent to adoption is required."). This statute states, in pertinent part:

> Unless consent is not required under G.S. 48-3-603, a petition to adopt a minor may be granted only if consent to the adoption has been executed . . . :
>
> . . . .
>
> (2) In a direct placement, by:
>
>> . . . .
>>
>> b. Any man who may or may not be the biological father of the minor but who:
>>
>>> . . . .
>>>
>>> 4. Before the earlier of the filing of the petition or the date of a hearing under G.S. 48-2-206, has acknowledged his paternity of the minor and
>>>
>>>> . . . .
>>>>
>>>> II. Has provided, in accordance with his financial means, reasonable and consistent payments for the support of the biological mother during or after the term of pregnancy, or the support of the minor, or both, which may include the payment of medical expenses, living expenses, or other tangible means of support, and has regularly visited or communicated, or attempted to visit or communicate with the biological mother during or after the term of pregnancy, or with the minor, or with both . . . .

N.C.G.S. § 48-3-601(2)(b)(4)(II) (1999).

**IN RE ADOPTION OF BYRD**

[354 N.C. 188 (2001)]

We believe the General Assembly crafted these subsections of this statute primarily to protect the interests and rights of men who have demonstrated paternal responsibility and to facilitate the adoption process in situations where a putative father for all intents and purposes has walked away from his responsibilities to mother and child, but later wishes to intervene and hold up the adoption process. Such a scenario is a far cry from the one in the case at hand. In terms of acknowledgment of responsibility and expression of desire to be a father, respondent did virtually all that could reasonably be expected of any man, and certainly of a seventeen-year-old, under the circumstances. Nevertheless, the statute is clear in its requirements, and respondent must have satisfied the three prerequisites stated, prior to the filing of the adoption petition, in order for his consent to be required. Respondent must have acknowledged paternity, made reasonable and consistent support payments for the mother or child or both in accordance with his financial means, and regularly communicated or attempted to communicate with the mother and child. Under the mandate of the statute, a putative father's failure to satisfy any of these requirements before the filing of the adoption petition would render his consent to the adoption unnecessary.

In this case, respondent's actual and attempted communication with O'Donnell and the child is not at issue, in that his communication with O'Donnell clearly was adequate for purposes of the statute. However, the other two requirements are matters of contention in this case.

Respondent first contends that the Court of Appeals erred in affirming the trial court's conclusion of law that he did not acknowledge paternity of the minor child prior to the filing of the adoption petition. We agree.

Section 48-3-601(2)(b)(4)(II) contains no specific requirements as to the manner of acknowledgment. In 1995, the legislature amended the prior adoption statute, N.C.G.S. § 48-6(a)(3) (1984), and deleted the requirement that the putative father must acknowledge paternity by affidavit. *See In re Baby Girl Dockery*, 128 N.C. App. 631, 633 n.1, 634, 495 S.E.2d 417, 419 n.1 (1998). "In regard to paternity actions, the term 'acknowledgment' generally has been held to mean the recognition of a parental relation, either by written agreement, verbal declarations or statements, by the life, acts, and conduct of the parties, or any other satisfactory evidence that the relation was recognized and admitted." *Carpenter v. Tony E. Hawley, Contr'rs*, 53 N.C. App. 715,

**IN RE ADOPTION OF BYRD**

[354 N.C. 188 (2001)]

720, 281 S.E.2d 783, 786, *appeal dismissed and disc. rev. denied*, 304 N.C. 587, 289 S.E.2d 564 (1981). Thus, currently, "acknowledgment" may be made orally or in writing, or may be demonstrated by the conduct of the putative father.

Respondent's actions in the instant case satisfy the statutory requirement for acknowledgment of paternity under N.C.G.S. § 48-3-601(2)(b)(4)(II). Under the circumstances, respondent could not reasonably have been expected to do more. After learning of O'Donnell's pregnancy on 22 September 1997, respondent readily and unconditionally acknowledged his paternity of the unborn child, and he maintained this posture through mid-November 1997. In late September 1997, respondent spent the night with O'Donnell and discussed the pending birth of the child. In September and October 1997, O'Donnell visited respondent approximately once a week and discussed various issues with him, including the pregnancy. Throughout this period, respondent unequivocally expressed his desire to be the child's father and a part of its life.

However, in mid-November 1997, O'Donnell was given a revised due date by a second doctor, and based on this new date, she advised respondent there was a possibility that another man was the biological father of the child. Even though this revised due date and the mother herself created uncertainty as to the identity of the biological father, respondent continued to acknowledge his possible paternity, and his willingness to accept that responsibility, conditioned only upon a proven biological link to the child.

Arguably, it would seem to strain logic and any practical legislative intent to require a putative father to blindly and relentlessly acknowledge more than the biological mother herself, especially in the face of resistance from her. However, we need not decide this issue today, as we conclude that under the circumstances of this case, respondent unconditionally acknowledged his fatherhood for a substantial and sufficient amount of time after initially learning of the pregnancy.

This initial period of unconditional acknowledgment by respondent is key to our belief that he did as much as possible, under the circumstances, to satisfy the acknowledgment requirement of N.C.G.S. § 48-3-601(2)(b)(4)(II). During the months when both O'Donnell and respondent believed that he was the father, he clearly acknowledged his paternity and never wavered from this belief until faced with the understandably surprising news from the mother that another man

actually may be the biological father. Even though respondent later conditioned his acknowledgment upon proof of a biological link, his words and actions, when considered as a whole, suffice to satisfy the statute.

We recognize the legislature's apparent desire for fatherhood to be acknowledged definitively regardless of biological link. We also recognize the importance of fixing parental responsibility as early as possible for the benefit of the child. Yet, fundamental fairness dictates that a man should not be held to a standard that produces unreasonable or illogical results. We also believe that the General Assembly did not intend to place the mother in total control of the adoption to the exclusion of any inherent rights of the biological father. As respondent did unconditionally acknowledge his paternity prior to receiving news that he may not be the father based on the revised due date, we conclude that he is not required under the statute to continue to acknowledge his paternity blindly and without question under the circumstances of this case, which included the sustained resistance to his involvement from the mother of the child.

Respondent next contends that the Court of Appeals erred in affirming the trial court's conclusion of law that he did not provide, in accordance with his financial means, reasonable and consistent payments for the support of the biological mother during or after the term of the pregnancy, or the support of the minor, or both. We disagree.

The "support" required under N.C.G.S. § 48-3-601(2)(b)(4)(II) is not specifically defined. We believe, however, that "support" is best understood within the context of the statute as actual, real and tangible support, and that attempts or offers of support do not suffice. Statutory language supports this conclusion. While "attempted" communication satisfies the statute, there is no such language used to describe the support requirement. N.C.G.S. § 48-3-601(2)(b)(4)(II). Presumably, the General Assembly intended a different meaning for the support prong of the test because of the differing language—one that excludes attempt to provide support. The statute also states that support may include "the *payment* of medical expenses, living expenses, or other *tangible means of support*," thus reflecting actual support provided. *Id.* (emphasis added).

Notwithstanding our holding that respondent acknowledged his paternity, we conclude that he did not consistently provide the kind

IN RE ADOPTION OF BYRD

[354 N.C. 188 (2001)]

of tangible support required under the statute. We recognize that petitioners filed their adoption petition the day after the child's birth, thus making it almost impossible to provide support directly to her. Nevertheless, respondent never provided tangible support for the mother or expected child, even when he was unconditionally acknowledging his paternity prior to 14 November 1997. In fact, respondent never provided tangible support within his financial means to mother or child at any time during the relevant period before the filing of the adoption petition. Given this lack of support, we cannot say that respondent satisfied the statutory requirement.

While the putative father is required only to pay support in accordance with his financial means, there was sufficient evidence in this case to support the trial court's findings of fact concerning his ability to make some payment in support. Respondent was capable of gainful employment during the relevant time period. Respondent lived rent-free with his grandparents for most of the relevant period. He worked with his grandfather, making $80 to $90 per week. He held no regular employment, however, until early November 1997, when he moved to Nags Head to seek full-time employment in order to save money for the child. While he worked two different full-time jobs and had $50 a week left over after paying all of his expenses, O'Donnell did not receive any support from respondent during this time from late December 1997 through the date of Rachel's birth. On the date of Rachel's birth, respondent purchased a $100 money order and gave it, along with some baby clothing, to his mother to forward to O'Donnell. However, the money order and clothing were not mailed to O'Donnell until 9 March 1998, after the filing of the adoption petition.

While we recognize the practical importance of family assistance, under the circumstances of this case, attempts or offers of support, made by the putative father or another on his behalf, are not sufficient for purposes of the statute. This Court has ruled that support paid or offered by a third party on a parent's behalf does not relieve that parent from his or her own support obligations. *Alamance County Hosp., Inc. v. Neighbors*, 315 N.C. 362, 365, 338 S.E.2d 87, 89 (1986) (stating that "[a] father cannot contract away or transfer to another his responsibility to support his children"). Likewise, the money order and clothes sent to O'Donnell by respondent, again through his mother, arrived too late, as the statute specifically provides for the relevant time period to end at the filing of the adoption petition. *See* N.C.G.S. § 48-3-601(2)(b)(4)(II). Such gifts only evidence

respondent's ability to provide support within the relevant period. Most importantly, they highlight the fact that even when respondent unconditionally acknowledged his fatherhood, he did not provide any support to the mother or expected child.

We thus conclude that respondent did not satisfy each of the specific requirements of N.C.G.S. § 48-3-601(2)(b)(4)(II) and that his consent is not required for the adoption. The interests of the child and all other parties are best served by an objective test that requires unconditional acknowledgment and tangible support. While respondent did acknowledge his paternity in accordance with the statute, he failed to provide tangible support to mother and child within his financial means, even when he unconditionally believed he was the father. All requirements of the statute must be met in order for a father to require his consent to an adoption. While respondent demonstrated remarkable resolve and a commendable sense of responsibility and concern for a seventeen-year-old father, he did not meet his statutory burden in this case, and thus, for the reasons discussed above, the decision of the Court of Appeals is

AFFIRMED.

Justice BUTTERFIELD concurring in part and dissenting in part.

I concur with the majority's conclusion that respondent acknowledged paternity. Because I believe that respondent also met the support prong of N.C.G.S. § 48-3-601, I respectfully dissent.

Under N.C.G.S. § 48-3-601, consent to adoption is required of the following individual:

b. Any man who may or may not be the biological father of the minor but who:

. . . .

4. Before the earlier of the filing of the petition or the date of a hearing under G.S. 48-2-206, has acknowledged his paternity of the minor and

. . . .

II. Has provided, *in accordance with his financial means*, reasonable and consistent payments for the support of the biological mother during or after the term of pregnancy, or the support of the minor, or

> both, . . . and has regularly visited or communicated, or attempted to visit or communicate with the biological mother during or after the term of the pregnancy, or with the minor, or with both . . . .

N.C.G.S. § 48-3-601(2)(b)(4)(II) (1999) (emphasis added).

"In matters of statutory construction, our primary task is to ensure that the purpose of the legislature, the legislative intent, is accomplished." *Electric Supply Co. of Durham v. Swain Elec. Co.*, 328 N.C. 651, 656, 403 S.E.2d 291, 294 (1991). Furthermore, when interpreting a statute, this Court presumes that the legislature acted with reason and common sense, and that it did not intend an unjust result. *In re Brake*, 347 N.C. 339, 341, 493 S.E.2d 418, 420 (1997). In my opinion, the majority's interpretation of N.C.G.S. § 48-3-601 as applied to the instant case brings about an unjust result.

The evidence shows, and the trial court found, that "on the date of [the child's] birth [4 March 1998], the respondent purchased a $100.00 money order and some baby clothing and gave the same to his mother to forward to O'Donnell. This money order and clothing [were] not mailed to O'Donnell until March 9, 1998." The majority states that the $100.00 money order respondent purchased arrived too late to satisfy the statute. I believe that respondent acted in conformity with the statute in offering support. He went to Nags Head to make money to save for the child. He then learned that he may or may not be the father, returned to his grandparents' home, and failed to find gainful employment. Respondent then set about obtaining his GED. Given respondent's age, his recognition that he had to have more education to secure better employment is, in my judgment, worthy of commendation. Only during the period from 22 September 1997, the date respondent was informed of the pregnancy, through 14 November 1997, the date he learned that he may not be the father, did respondent believe himself to be the only possible father of the child. This demonstration of self-improvement and his continued attempts to communicate with the mother when faced with the possibility that he may not be the father convinces me that he acted reasonably and in accordance with his means to support the mother and child. Disregarding the offer by respondent's mother to allow O'Donnell to live with her, the evidence that respondent saved at least $100.00 for the child is noteworthy. The fact that respondent did not place $50.00 a week into O'Donnell's hands does not alter my analysis. Of particular significance to my analysis is that O'Donnell rebuffed respond-

**IN RE ADOPTION OF BYRD**

[354 N.C. 188 (2001)]

ent's mother's offer and stated each time respondent asked that she did not need anything. I find the fact that he was anticipating support of the child after the child's birth very persuasive. The statute allows for support of the mother during pregnancy or of the minor after birth. But for the filing of the petition on the day after the child was born, respondent's money would clearly have counted as support of the minor, as he intended. I believe a liberal, rather than strict, construction of the statute is necessary. Such a construction of the statute supports my proposition that the statute is satisfied when adequate attempts are made to provide financial support.

While the statute does specifically state that there can be attempted communication with the mother, it does not speak directly to attempted support. I believe that attempted support is implicit in the statute. Under the majority's holding, attempted support will never satisfy the statute. The putative father, following this reasoning, must actually give monetary support to the mother or to her creditors. The mother can defeat the putative father's attempts by simply refusing or forestalling the offers. Even if the putative father sets up some sort of fund for the child after the mother has rejected offers of support, this must also be classified as an attempt and would fail the majority's test. The mother can also defeat the putative father's attempts by secreting herself from the putative father during the entire pregnancy and refusing any contact with the putative father. Or it may be possible that the putative father may be completely unaware that he is to be a father until he receives notice of an adoption proceeding. This last scenario tends to point to an inconsistency of purpose in the statute itself, rather than in the majority's reasoning. Nonetheless, I do not believe that the legislature intended to enact a law that could be so easily circumvented by a mother failing to accept or discouraging offers of support, thereby giving the mother unilateral authority in the adoption. The majority correctly stated the purpose of the statute as follows:

> We believe the General Assembly crafted these subsections of this statute primarily to protect the interests and rights of men who have demonstrated paternal responsibility and to facilitate the adoption process in situations where a putative father for all intents and purposes has walked away from his responsibilities to mother and child, but later wishes to intervene and hold up the adoption process.

Therefore, I believe that attempted support or actions that manifest support for the child are included under the statute.

IN RE STEPHENSON

[354 N.C. 201 (2001)]

I am also concerned that this holding is in conflict with the prior holdings of this Court in *Petersen v. Rogers*, 337 N.C. 397, 445 S.E.2d 901 (1994), and *Price v. Howard*, 346 N.C. 68, 484 S.E.2d 528 (1997). These cases stand for the well-established rule from the United States Supreme Court that the "interest of a parent in the companionship, care, custody, and management of his or her children" is, "absent a powerful countervailing interest, protect[ed]." *Stanley v. Illinois*, 405 U.S. 645, 651, 31 L. Ed. 2d 551, 558 (1972). Although this constitutional argument was not raised at trial or on appeal, I find its mentioning necessary in light of the majority's holding. There are no facts to indicate that respondent has acted inconsistently with his protected parental interests, a required showing under *Price* in order for a parent to be divested of his or her "constitutionally protected paramount interest in the companionship, custody, care, and control of his or her child." *Price*, 346 N.C. at 79, 484 S.E.2d at 534.

For these reasons, I would reverse the Court of Appeals on the issue of support.

Justice WAINWRIGHT joins in this opinion, concurring in part and dissenting in part.