STEPHENS, Judge.
 

 *179
 
 Petitioners Michael T. Morris and Carolyn L. Morris appeal from the district court's order concluding that Respondent-father Venson Allen Westgate's consent is required to proceed with the adoption of his minor daughter, C.H.M. We affirm the district court's order.
 

 Factual Background and Procedural History
 

 Westgate is a 31-year-old resident of Illinois. Beginning in 2009, he became involved in an on-and-off intimate relationship with C.H.M.'s biological mother, Brandi Wood, who also resided in Illinois at that time. In 2012, Westgate saved money for several months to purchase an engagement ring and asked Wood to marry him, but she rejected his proposal. However, she later became pregnant after the two rekindled their intimate relationship in late October or early November 2012.
 

 *180
 
 In January 2013, Wood married a member of the military stationed in North Carolina, but she remained in Illinois. Around the same time, Wood told Westgate that she was pregnant and that he might be the father; however, Wood also demanded that Westgate keep her pregnancy secret. Westgate promised that he would not tell anyone about Wood's pregnancy until she told him he could, but continued to visit Wood at the Dollar General store where she worked and also communicated with her extensively on the social networking site Facebook. In February 2013, shortly after learning of Wood's pregnancy, Westgate offered via Facebook to start setting money aside for their child; although Wood rebuffed this offer, Westgate replied that he wanted to do so anyway in order to ensure that the child had everything he or she would ever need. In addition to offering financial support, Westgate also offered to pay for Wood's medical bills and to purchase specific items for the child. Wood refused these offers as well. However, in March 2013, she allowed Westgate to accompany her to a prenatal medical appointment, which was paid for by her husband's insurance. In Facebook messages he sent to Wood around this time, Westgate expressed his enthusiasm for becoming a father and his concerns for the health of Wood and her child, discussed research he had conducted into healthcare providers, suggested potential baby names, requested pregnancy pictures, and stated his intent to be present at the child's birth. In the months that followed, Wood told Westgate that it was impossible for him to be the father of her child because she had become pregnant as a result of a sexual assault by an unknown person in the autumn of 2012. Westgate reaffirmed that if the child was his, he wanted to be there as a father, and repeatedly requested to take a DNA test to confirm or exclude the possibility of his paternity, but Wood refused.
 

 Before giving birth, Wood moved to North Carolina to join her husband in Onslow County. Westgate did not know Wood's North Carolina phone number or address and had no way of contacting her other than Facebook messages; eventually, Wood blocked Westgate on Facebook. On 28 June 2013, Wood gave birth to C.H.M. and subsequently placed her for adoption with A Child's Hope, LLC ("ACH"), an adoption
 
 *596
 
 agency. Wood did not inform Westgate that she had given birth, did not tell him she had placed C.H.M. for adoption, nor did she identify Westgate to the adoption agency as the child's biological father; instead, Wood told ACH that her pregnancy resulted from a sexual assault by an unknown person. On 9 July 2013, the Morrises filed a petition in Wake County District Court to adopt C.H.M.
 

 On 27 July 2013, Wood returned to Illinois and asked Westgate to meet her at a bar, at which point he realized she was no longer pregnant.
 

 *181
 
 However, Wood did not inform Westgate she had placed C.H.M. for adoption and instead told him that the child was hospitalized due to a heart problem. Westgate again requested a DNA test but Wood refused, offering an array of reasons why he could not be the father, including that her pregnancy had resulted from a sexual assault, that the timing of conception and birth did not align with their intimate encounter, and that Westgate's blood type and hair color did not match that of the child. At some point in September or October 2013, Westgate began to contact attorneys in Illinois and North Carolina to inquire about his legal rights. However, in November 2013, Wood admitted to Westgate that she had placed the child for adoption and that he was the father. On 27 November 2013, Westgate was served with a notice of pendency of adoption proceedings. A subsequent DNA test, paid for by ACH, confirmed Westgate's paternity.
 

 On 23 December 2013, Westgate filed a response to notice and objection to the adoption. A hearing in this matter was held during the 23 April 2014 civil session of Wake County District Court, the Honorable Debra Sasser, Judge presiding. At the hearing, Westgate testified that he has been employed for several years as a repairman for J & J Ventures in Illinois and earned approximately $35,000 per year during the term of Wood's pregnancy. Westgate testified further that once he learned Wood was pregnant, on several occasions via Facebook messages and in person, he offered to provide financial support for Wood and C.H.M. and told Wood he had been saving money to do so, but that Wood rebuffed him because she did not want her husband to know about their relationship. According to Westgate, despite Wood's refusal to accept financial support, he immediately began saving money for his child by depositing cash withdrawn from ATMs, cashback purchases from Walmart, and monthly dividend checks into a "lockbox" he kept in his residence. Westgate testified that he typically deposited at least $100 to $140 per month and sometimes more into the lockbox. He also testified that although he had a bank account, he generally lived paycheck to paycheck and chose to utilize the lockbox because he wanted to assure the funds for his child were kept separate for her exclusive use. Westgate provided his bank statements dating back to before C.H.M.'s conception, and testified extensively about his monthly expenses and withdrawals. Westgate also introduced the lockbox into evidence, which, by the time of the hearing, held $3,260. Westgate acknowledged that he had contacted attorneys in Illinois and North Carolina several months after his daughter's birth in September and October 2013 to inquire about suing Wood for custody or demanding a DNA test, but stated that he planned to pay any legal or associated fees from his bank account, rather than
 
 *182
 
 from the lockbox. In addition, Westgate testified that after the DNA test confirmed his paternity, he purchased items for C.H.M. and made arrangements to transfer his employment to the town in Illinois where his parents lived and to move in with them in order to better facilitate childcare for his daughter.
 

 Wood did not appear at the hearing. Although Wood had been served in Illinois with a subpoena to compel her appearance approximately one week prior to the hearing, counsel for the Morrises explained that after Wood was served, she contacted him. He informed her that if she was present in North Carolina, she would have to comply with the subpoena, but in the event she had changed her state of residence to Illinois, he did not believe the subpoena was valid.
 

 On 9 February 2015, the district court entered an order in favor of Westgate. In its findings of fact, the court found that Westgate had acknowledged paternity of C.H.M. and had regularly visited and communicated with Wood throughout her pregnancy. The
 
 *597
 
 court also found that "[w]hile there are legal issues in dispute the [c]ourt finds that the major fact in dispute is whether [Westgate's] testimony regarding putting money aside for the minor child and Mrs. Wood is credible." The court ultimately found Westgate's testimony credible. In light of the evidence that Wood refused to accept any financial support after Westgate told her he was saving money for their child, the court further found that Westgate
 

 made regular and consistent payments into his lock box/safe for the support of the minor child. These payments were made on a monthly (and sometimes more frequent) basis. While these funds were not deposited into a bank or other financial institution, they were deposited into a safe, and these funds were earmarked for the minor child. No other funds were deposited into this safe.
 

 After entering findings regarding Westgate's income, the court found as fact and concluded as a matter of law that, in accordance with his financial means, Westgate's regular and consistent deposits into the lockbox were a reasonable method of providing support for C.H.M. The court also concluded that Westgate had "presented a legally sufficient payment record of his efforts to provide support." Consequently, the court determined that Westgate had satisfied all three of the statutory requirements imposed by section 48-3-601 of our General Statutes, and therefore his consent was required to proceed with the adoption. The Morrises gave notice of appeal to this Court on 11 March 2015.
 

 *183
 

 Analysis
 

 The Morrises argue that the district court erred in determining that Westgate's consent was necessary for the adoption. Specifically, the Morrises contend that Westgate failed to satisfy the statutory support requirement imposed by section 48-3-601 of our General Statutes. We disagree.
 

 Adoption proceedings are "heard by the court without a jury." N.C. Gen.Stat. § 48-2-202 (2015).
 

 Our scope of review, when the [c]ourt plays such a dual role, is to determine whether there was competent evidence to support its findings of fact and whether its conclusions of law were proper in light of such facts. This Court is bound to uphold the trial court's findings of fact if they are supported by competent evidence, even if there is evidence to the contrary. Finally, in reviewing the evidence, we defer to the [district] court's determination of witnesses' credibility and the weight to be given their testimony.
 

 In re Adoption of Shuler,
 

 162 N.C.App. 328
 
 , 330-31,
 
 590 S.E.2d 458
 
 , 460 (2004) (citations and internal quotation marks omitted). The district court's conclusions of law are subject to
 
 de novo
 
 review.
 
 See generally
 

 In re Adoption of Byrd,
 

 354 N.C. 188
 
 ,
 
 552 S.E.2d 142
 
 (2001).
 

 Chapter 48 of our General Statutes governs adoption procedures in North Carolina. Section 48-3-601 makes the consent of certain individuals mandatory before a court may grant an adoption petition, and provides that a putative father's consent is only required if he
 

 [b]efore the earlier of the filing of the [adoption] petition or the date of a hearing under [section] 48-2-206, has acknowledged his paternity of the minor and
 

 ...
 

 [h]as provided, in accordance with his financial means, reasonable and consistent payments for the support of the biological mother during or after the term of the pregnancy, or the support of the minor, or both, which may include the payment of medical expenses, living expenses, or other tangible means of support, and has regularly visited or communicated, or attempted to communicate with
 
 *184
 
 the biological mother during or after the term of pregnancy, or with the minor, or with both[.]
 

 N.C. Gen.Stat. § 48-3-601(2)(b)(4)(II) (2015). In construing the purpose of section 48-3-601 in
 
 In re Adoption of Byrd,
 
 our Supreme Court stated:
 

 We believe the General Assembly crafted these subsections of this statute primarily to protect the interests and rights of men who have demonstrated paternal responsibility and to facilitate the adoption process in situations where a putative father for all
 
 *598
 
 intents and purposes has walked away from his responsibilities to mother and child, but later wishes to intervene and hold up the adoption process.
 

 Byrd,
 

 354 N.C. at 194
 
 ,
 
 552 S.E.2d at 146
 
 . In
 
 Byrd,
 
 the putative father, Gilmartin, was an unwed 17-year-old who impregnated his high school girlfriend, O'Donnell. Gilmartin held several part-time jobs in Pea Ridge, where he lived free of charge with his uncle and later his grandparents and, after learning of the pregnancy, he offered to help support and raise the child.
 

 Id.
 

 at 190
 
 ,
 
 552 S.E.2d at 144
 
 . In addition, his family offered O'Donnell a place to live during her pregnancy as well as assistance with her medical bills and living expenses.
 
 See
 
 id.
 

 O'Donnell declined these offers.
 
 See
 
 id.
 

 At one point, Gilmartin moved to Nags Head to work in construction in an effort to earn and save money for the care of O'Donnell and her expected child.
 
 See
 
 id.
 

 However, Gilmartin failed to save any money and ultimately provided no financial support to O'Donnell during the term of her pregnancy.
 
 See
 
 id.
 

 One day after giving birth, O'Donnell placed the child for adoption, and an adoption petition was filed the same day.
 

 Id.
 

 at 191
 
 ,
 
 552 S.E.2d at 145
 
 . Four days later, Gilmartin mailed a money order for $100 and some baby clothing to O'Donnell, and subsequently sought custody of the child.
 
 See
 
 id.
 

 In evaluating whether Gilmartin had satisfied the statutory support requirement imposed by section 48-3-601, our Supreme Court reasoned that "support is best understood within the context of the statute as actual, real and tangible support, and that attempts or offers of support do not suffice."
 

 Id.
 

 at 196
 
 ,
 
 552 S.E.2d at 148
 
 (internal quotation marks omitted). Because the record established that Gilmartin had at least some income during the term of O'Donnell's pregnancy but "never provided tangible support within his financial means to [O'Donnell or her child] at any time during the relevant period before the filing of the adoption petition," the Court held that he failed to satisfy the statutory support requirement, and therefore his consent was not required for the adoption.
 

 Id.
 

 at 197
 
 ,
 
 552 S.E.2d at 148
 
 . In summarizing its holding, the Court emphasized that
 
 *185
 
 "[t]he interests of the child and all other parties are best served by an objective test that requires unconditional acknowledgment [of paternity] and tangible support," and reiterated that "attempts or offers of support, made by the putative father or another on his behalf, are not sufficient for the purposes of the statute."
 

 Id.
 

 at 197-98
 
 ,
 
 552 S.E.2d at 148-49
 
 .
 

 In
 
 In re Adoption of Anderson,
 

 360 N.C. 271
 
 ,
 
 624 S.E.2d 626
 
 (2006), the Court reaffirmed the distinction drawn in
 
 Byrd
 
 between actual, tangible support and mere offers or attempts. There, the putative father, Avery, impregnated his high school girlfriend, Anderson.
 
 Id.
 
 at 272,
 
 624 S.E.2d at 627
 
 . After learning of the pregnancy, Avery, who lived with his parents and paid nothing for rent, utilities, food, or clothing, dropped out of school, obtained gainful employment at the International House of Pancakes, and used some of his earnings to purchase a car for $1,000 and pay for automobile insurance.
 
 Id.
 
 at 273-74,
 
 624 S.E.2d at 627-28
 
 . At trial, Avery acknowledged that he never provided any financial support to Anderson before the filing of the adoption petition, but introduced testimony from several witnesses that prior to the filing of the adoption petition, he repeatedly offered Anderson money in person at school, which she refused; drove to her family's residence and attempted to deliver an envelope containing a check for $100, which her father refused; and also had his attorney send her a letter acknowledging paternity and offering financial assistance to her and the child.
 
 Id.
 
 at 274,
 
 624 S.E.2d at 628
 
 . The trial court nevertheless concluded that Avery failed to satisfy the statutory support requirement and therefore his consent to the adoption was not required.
 

 Id.
 

 When the case reached our Supreme Court, Avery contended that strict adherence to the standard articulated in
 
 Byrd
 
 risked inviting mothers "to thwart the rights of putative fathers simply by declining to accept support."
 
 360 N.C. at 275
 
 ,
 
 624 S.E.2d at 628
 
 . In rejecting this argument, our Supreme Court stated, "We see no reason to modify
 
 Byrd
 
 's bright-line rule. The rule comports with the language of the subsection and reflects the importance of a clear judicial process for adoptions."
 
 Id.
 
 at 278,
 
 624 S.E.2d at 630
 
 (internal quotation
 
 *599
 
 marks omitted). After reaffirming that mere offers of support are insufficient to satisfy the statutory support requirement, the Court examined the record and determined that competent evidence supported the trial court's factual finding-that despite possessing adequate resources, Avery never provided actual financial support for Anderson.
 
 See
 
 id.
 

 In upholding the trial court's conclusion that Avery's consent to the adoption was not required, the Court also explained that "our resolution of the instant case does not grant biological mothers the power to thwart the rights of putative fathers" because the language of section 48-3-601 "obliges
 
 *186
 
 putative fathers to demonstrate parental responsibility with reasonable and consistent payments
 
 for
 
 the support of the biological mother."
 
 Id.
 
 at 279,
 
 624 S.E.2d at 630
 
 (citation and internal quotation marks omitted; emphasis in original). As the Court reasoned,
 

 [t]he legislature's deliberate use of "for" rather than "to" suggests the payments contemplated by the subsection need not always go directly to the mother. So long as the father makes reasonable and consistent payments
 
 for
 
 the support of mother or child, the mother's refusal to accept assistance cannot defeat his paternal interest.
 

 Id.
 

 (emphasis in original). The Court went on to note that Avery "could have supplied the requisite support any number of ways, such as opening a bank account or establishing a trust fund for the benefit of Anderson or their child."
 
 Id.
 
 at 279,
 
 624 S.E.2d at 631
 
 . "Had he done so, Anderson's intransigence would not have prevented him from creating a payment record through regular deposits into the account or trust fund in accordance with his financial resources."
 

 Id.
 

 This Court has since recognized that
 
 Anderson
 
 did not purport to provide an exhaustive list of ways that a putative father can satisfy the statutory support requirement when his child's biological mother refuses his offers of support.
 
 See
 

 In re Adoption of K.A.R.,
 

 205 N.C.App. 611
 
 ,
 
 696 S.E.2d 757
 
 (2010),
 
 disc. review denied,
 

 365 N.C. 75
 
 ,
 
 706 S.E.2d 236
 
 (2011). In
 
 K.A.R.,
 
 the putative father, Alvarez, was an unemployed high school dropout who lived with his parents.
 
 Id.
 
 at 612-13,
 
 696 S.E.2d at 759
 
 . However, after learning that his girlfriend, Richardson, was pregnant, Alvarez obtained employment at a rate of $8.00 per hour, attended prenatal classes with Richardson, and accompanied her to doctor's visits until she requested that he stop.
 
 Id.
 
 at 613,
 
 696 S.E.2d at 759
 
 . As soon as Alvarez had income from his job, and prior to the child's birth and the filing of the adoption petition, "he began purchasing equipment and supplies for the child, such as: a car seat, a baby crib mattress, and clothing worth over $200."
 

 Id.
 

 Based on this evidence, the district court concluded that Alvarez had satisfied the statutory support requirement, and that his consent was therefore required for the adoption.
 

 Id.
 

 On appeal, we affirmed the district court's determination, emphasizing that, in contrast to the putative fathers in
 
 Byrd
 
 and
 
 Anderson,
 
 Alvarez "independently provided items of support for the child, even after his efforts to provide support and assistance directly to [Richardson] were rebuffed."
 
 Id.
 
 at 617,
 
 696 S.E.2d at 761
 
 . Because competent evidence supported the district court's findings that the support Alvarez provided was consistent and reasonable in accordance with his financial means,
 
 *187
 
 we held that Alvarez had complied with "the bright-line requirement [established in
 
 Byrd
 
 and reaffirmed in
 
 Anderson
 
 ]-that the support contemplated by the statute must be provided prior to the filing of the petition."
 
 Id.
 
 at 617,
 
 696 S.E.2d at 762
 
 . In so holding, we explained:
 

 There are few options available to a young unmarried biological father who has shown in many ways his strong desire to keep his child, and whose efforts to provide direct support to the mother have been rebuffed. [The
 
 Anderson
 
 Court] suggested one way a father could provide support independently of the mother; the father in this case, as determined by the trial court, has shown another.
 

 Id.
 

 In the present case, the Morrises contend that the district court erred in concluding that Westgate satisfied the statutory support requirement imposed by section 48-3-601. Specifically, the Morrises argue that Westgate's efforts to save money for C.H.M. in
 
 *600
 
 the lockbox he kept in his home were legally insufficient to satisfy the statutory support requirement because, by failing to either keep a detailed ledger of his deposits in the lockbox or subpoena records of cashback purchases he testified he made at Walmart, Westgate failed to create the sort of "payment record" the Morrises claim is required under
 
 Anderson
 
 to prove that he provided tangible support through reasonable and consistent payments according to his financial means. This argument is unavailing. Our holding in
 
 K.A.R.
 
 demonstrates that although
 
 Anderson
 
 suggested that opening a trust fund or bank account would satisfy the statutory support requirement,
 
 Anderson
 
 did not purport to provide an exhaustive list of ways for a father to do so, nor did it explicitly impose any sort of specific accounting requirements. Indeed, contrary to the Morrises' characterization of the "payment record" as a bright line rule,
 
 K.A.R.
 
 also indicates that the objective, bright line test established in
 
 Byrd
 
 and reaffirmed in
 
 Anderson
 
 focused on the distinction between mere offers or attempts and actual, tangible support. While a formal record of payments by a father would certainly be illustrative of the latter,
 
 K.A.R.
 
 mandates that where there is competent evidence in the record to support a district court's determination that, prior to the filing of an adoption petition, a putative father provided reasonable and consistent payments for the support of his child in accordance with his financial means, this Court will not disturb such a determination on appeal.
 

 In the present case, the Morrises challenge numerous findings related to the court's determination that Westgate satisfied the statutory support
 
 *188
 
 requirement, complaining, for example, that Westgate's testimony that he made offers of financial support to Wood and saved money for C.H.M. was uncorroborated by any other witness, that his bank records do not definitively prove that the cash he withdrew was deposited in the lockbox, and that the director of ACH testified that Westgate told her via telephone he was saving money to hire an attorney and pay for DNA testing. However, our standard of review makes clear that this Court is "bound to uphold the trial court's findings of fact if they are supported by competent evidence, even if there is evidence to the contrary," and we must "defer to the [district] court's determination of witnesses' credibility and the weight to be given their testimony."
 
 Shuler,
 

 162 N.C.App. at 330-31
 
 ,
 
 590 S.E.2d at 460
 
 . Based on the record before us-which includes extensive testimony from Westgate regarding his efforts to set aside money for C.H.M. in the lockbox, as well as over one year's worth of his bank records, and hundreds of pages of his Facebook messages with Wood-we conclude there is ample evidence to support the district court's determination that Westgate provided reasonable and consistent payments for the support of C.H.M. before the filing of the adoption petition.
 

 The Morrises also argue that the district court improperly shifted Westgate's burden of proof when it found his testimony credible despite its additional findings that Wood was "the only witness who could either confirm or contradict [Westgate's] testimony as to his offers of financial support for her or the minor child that he made through sources other than social media accounts," that Wood did not appear at the hearing and failed to comply with the subpoena served on her in Illinois, and that there was no evidence the Morrises or ACH ever sought to depose Wood or compel her appearance at the hearing. While the Morrises may be correct that they were under no obligation to produce a witness who could corroborate Westgate's testimony, we do not read the court's findings on this point as any indication that it somehow penalized the Morrises or rewarded Westgate or otherwise shifted the burden of proof based on Wood's failure to appear. While these challenged findings shed light on the context in which the court determined Westgate's testimony was credible, they do nothing to undermine the competent evidence in the record on which that determination was based. We are similarly unpersuaded by the Morrises' related argument that Westgate failed to meet his burden of proof based on their contention that the subpoena served on Wood in Illinois was invalid. Despite the Morrises' protestations to the contrary, we do not believe that Wood's absence
 
 *601
 
 from the hearing, standing alone, rendered Westgate's testimony incompetent or precluded the court from finding it credible. In our view, the Morrises'
 
 *189
 
 arguments on this point serve as little more than an indirect invitation to second-guess the district court's credibility determinations, which we decline to do.
 

 In addition, the Morrises also challenge the sufficiency of the court's findings that the support Westgate provided was consistent with his financial means. Specifically, they highlight the court's finding that "the evidence presented at trial was insufficient to determine a presumptive amount of child support" under our State's child support guidelines. The Morrises contend that this finding demonstrates Westgate failed to meet his burden of proof. This argument misconstrues our case law as well as the court's findings on this issue. Our prior holdings recognize that the application of child support guidelines in calculating whether a putative father's payments were reasonable is a matter within the court's discretion.
 
 See
 

 Miller v. Lillich,
 

 167 N.C.App. 643
 
 , 647,
 
 606 S.E.2d 181
 
 , 183 (2004) ("Although such a measure is not required by [ section 48-3-601 ], it was within the [district] court's discretion to make its determination of reasonableness based on the comparison."). Moreover, in the present case, the court's findings make clear that "[t]here are no child support guidelines for the determination of the reasonable amount of support that a putative father should provide to a birth mother who is married to someone else at the time the putative father learns of the pregnancy," and that even if the guidelines were applicable, any attempt to calculate them would be futile in light of the fact that because Wood failed to appear at the hearing, there was no credible evidence of her income or living expenses while she was staying with her relatives in Illinois and her husband was living in North Carolina. In any event, we conclude that the court's determination that Westgate's regular and consistent deposits into his lockbox were reasonable in accordance with his financial means was adequately supported by competent evidence. This argument is without merit.
 

 For these reasons, the district court's order is
 

 AFFIRMED.
 

 Judges BRYANT and McCULLOUGH concur.