NEWBY, Justice.
In this case we consider whether the evidence was sufficient as a matter of law to support the trial court's order requiring respondent father's consent before proceeding with the adoption of minor child C.H.M. To protect the significant interests of the child, biological parents, and adoptive parents, Chapter 48 of our General Statutes, governing *806 adoption procedures in North Carolina, establishes clear, objective tests to determine whose consent is required before a court may grant an adoption petition. Under section 48-3-601, a putative father may unilaterally protect his paternal rights if he establishes that he has acknowledged his paternity, regularly communicated or attempted to communicate with the biological mother or minor child, and provided reasonable and consistent payments for the support of the biological mother, minor, or both, in accordance with his financial means. All of these measures must be accomplished no later than the filing of the adoption petition. As a matter of law respondent's evidence does not establish that he made reasonable and consistent payments for the support of the biological mother or minor child before the filing of the adoption petition. Because respondent failed to meet his burden of proving that he provided such support within the relevant statutory period, we conclude that the evidence is legally insufficient to support the trial court's order requiring respondent's consent. Accordingly, we reverse the decision of the Court of Appeals that affirmed the trial court's order.
From 2009 through 2012, respondent and the biological mother (Wood) had an "on and off" intimate relationship while they both lived in Illinois. In November 2012, Wood ended her relationship with respondent to resume a relationship with another man, whom she married shortly thereafter in January 2013. As respondent was aware, Wood's husband worked and resided in North Carolina, though she continued to stay in Illinois for several months. After Wood's marriage, respondent and Wood continued to communicate primarily through Facebook.
On 11 February 2013, Wood informed respondent that she was twenty weeks pregnant (or halfway through her pregnancy) with his child, but immediately told respondent to keep everything "as secret as possible." Upon learning he was the child's father, respondent told Wood he intended to "start setting money aside" for the child, but provided neither support at that time nor any details of his plan.
In March, respondent accompanied Wood to her first medical appointment and sonogram. The sonogram confirmed respondent's understanding of the timing of Wood's pregnancy, showing she was between her second and third trimesters. While respondent expressed his enthusiasm for becoming a father and offered to pay for the office visit, Wood refused respondent's offer because her husband's insurance covered the appointment cost. Out of concern that people in their small hometown would suspect something, respondent did not buy any baby items for C.H.M. during the pregnancy. In their Facebook messages between February and July 2013, respondent and Wood's primary method of communication, respondent offered Wood his emotional support but never stated that he was actually saving money for the child. Respondent did not give Wood any monetary payments for the minor child's support, and Wood rejected respondent's various offers of financial assistance.
After consistent communication between the two throughout February and March, on 9 April 2013, Wood falsely told respondent the child might not be his, contending she had been sexually assaulted around the time of conception. Thereafter, Wood refused respondent's requests for a paternity test.
Sometime in June, Wood moved to North Carolina to join her husband, and near the end of June (around her due date), Wood stopped communicating with respondent. On 28 June 2013, Wood gave birth to C.H.M. After C.H.M.'s birth, Wood contacted an adoption agency through a social worker and thereafter provided her affidavit that the pregnancy resulted from a sexual assault by an unknown assailant. Wood and her husband, the legally presumed father, signed relinquishments placing C.H.M. with the adoption agency. Knowing nothing about the possible involvement of respondent, the agency and petitioners, who wished to adopt C.H.M., proceeded with plans to establish a home for the child. On 9 July 2013, petitioners filed the adoption petition and received eleven-day-old C.H.M. into their home, where the child has been cared for during the almost five years of her life.
Though he was aware of Wood's approximate delivery date, respondent did not attempt to contact Wood via Facebook until the *807 end of July, a month after C.H.M.'s birth and following the adoption petition's filing. Several days later, Wood replied and met respondent during one of her return trips to Illinois, at which point he observed she was no longer pregnant. Later that evening, Wood told respondent that she had given birth to the child but that C.H.M. was still at the hospital. Finally, in September 2013, respondent contacted legal counsel about his potential paternal rights and the possibility of a paternity test. Wood told respondent in mid-November about C.H.M.'s adoption, at which time she first informed the adoption agency about respondent. The adoption agency contacted respondent and requested a paternity test. On 4 December 2013, respondent took a paternity test, which confirmed he is the biological father.
On 23 December 2013, more than five months after the adoption petition had been filed, respondent filed his formal objection to the adoption. At the hearing on the matter in April 2014, respondent offered evidence attempting to prove that he met all the statutory requirements for his consent to be necessary, including that he had made reasonable and consistent payments for the support of the minor child, thereby entitling him to object to the adoption. Respondent testified that he had set aside money for C.H.M. in a special location in his room, a "lockbox," in which he placed funds withdrawn from ATM transactions or obtained via "cash back" purchases from Walmart. Respondent provided bank statements from 2012 and 2013, which showed some sporadic withdrawals and general purchases from Walmart, though he provided no records showing the purpose of the withdrawals. Respondent produced no receipts indicating that he received cash back from any Walmart purchases within the statutorily relevant time frame, providing only two Walmart receipts from 2014, more than six months after the statutory deadline. Throughout the hearing, respondent offered no definitive testimony on the timing of his placement of any funds, before or after the adoption petition's filing on July 9, which may have resulted in cash for the lockbox.
The lockbox that respondent produced at the April 2014 hearing then contained $3260. Respondent admitted that the placement of funds in the lockbox was sporadic and was not comprised of an "exact amount each time," as the lockbox contained "just whatever [he] could afford here and there." Because respondent did not "keep[ ] records [he did not] really know" how much he was placing in the lockbox, though he thought it was somewhere around $100 to $140 per month. Respondent did not provide any records indicating the dates of any deposits or the amount of money in the lockbox before the statutorily relevant date, 9 July 2013. Respondent stated that he made no specific designation "on paper" or elsewhere regarding the money's purpose nor did he confide in anyone about his plan or the lockbox's existence. Though respondent subpoenaed Wood, who was then back in Illinois, so she could testify, Wood did not appear at the hearing, and respondent did not present any witnesses to confirm that he had placed money in the lockbox before the adoption petition was filed.
The trial court noted that whether respondent met the statutory requirements depended on its resolution of what it deemed to be the major factual dispute in the case, "whether Respondent/Father's testimony regarding putting money aside for the minor child and Mrs. Wood is credible." Based on respondent's evidence, the trial court made the following findings:
7(h). During Mrs. Wood's pregnancy and after the child's birth Respondent/Father saved money on a consistent and regular basis and designated this money for the minor child. Respondent/Father also testified that he disclosed to Mrs. Wood that he was saving money for the minor child.
....
13(e)(1). Respondent/Father never provided any actual financial payments to Mrs. Wood or to the minor child either prior to the filing of the petition or since the filing of the petition.
....
13(e)(9). From the time Mrs. Wood told him that she was pregnant with his child and continuing through the time of the instant hearing, Respondent/Father *808 made regular and consistent payments into his lock box/safe for the support of the minor child. These payments were made on a monthly (and sometimes more frequent) basis. While these funds were not deposited into a bank or other financial institution, they were deposited into a safe, and these funds were earmarked for the minor child. No other funds were deposited into this safe.
13(e)(10). At the time of the instant hearing, Respondent/Father had $3,260 in the safe.
13(e)(11). ... Prior to the filing of the petition, Respondent/Father earned $32,000 a year from [his] employment. His annual earnings are now around $35,000....
13(e)(12). Respondent/Father deposited at least $100-$140 a month into the safe for the benefit of Ms. Wood and the child, and on average, paid approximately $225 per month in support for the minor child.
Ultimately, the trial court concluded that
Respondent/Father's regular and consistent deposits into the safe were a reasonable method of providing support for the minor child and Mrs. Wood. His testimony regarding monthly deposits into his safe of at least $100-$140 per month, from the time he learned of Ms. Wood's pregnancy through the instant trial is credible.
Thus, considering evidence of events both before and after the petition filing date of 9 July 2013, the trial court concluded that respondent's "reasonable method" of saving met the requirements of section 48-3-601(2)(b)(4)(II). Moreover, the trial court deemed respondent's lump sum $3260 presented at trial, his uncorroborated testimony, and his production of general bank statements as having created "a legally sufficient payment record of his efforts to provide support." As such, the trial court determined that respondent's consent was required to proceed with the adoption.
The Court of Appeals affirmed, In re Adoption of C.H.M. , --- N.C. App. ----, ----, 788 S.E.2d 594, 601 (2016), opining that this Court's opinion in In re Adoption of Anderson , 360 N.C. 271, 624 S.E.2d 626 (2006), "did not purport to provide an exhaustive list of ways for a father to [comply with the statute], nor did it explicitly impose any sort of specific accounting requirements," In re C.H.M. , --- N.C. App. at ----, 788 S.E.2d at 600. The court also determined that whether respondent had presented adequate evidence to meet the payment prong of the statute is a factual finding as opposed to a legal conclusion, making that ruling subject to a deferential standard of review on appeal. Id. at ----, 788 S.E.2d at 600 (citing In re Adoption of Shuler , 162 N.C. App. 328, 330-31, 590 S.E.2d 458, 460 (2004) ). Thus, the court concluded that by considering all of respondent's evidence, in the form of his bank records, Facebook messages, and uncorroborated testimony about events before and after the adoption petition's filing, respondent produced sufficient evidence showing that he complied with the statutory requirements. Id. at ----, 788 S.E.2d at 600. We allowed the adoptive parents' petition for discretionary review to determine whether the trial court correctly concluded that respondent complied with the support payment requirement of section 48-3-601.
Because of a pregnancy's natural timetable and the need of a newborn to have a home, the adoption statutes provide a related window of time by which a putative father must meet clear statutory requirements that establish his paternal rights and make his consent to the adoption necessary. These statutory requirements enumerate objective tests to ensure that all parties involved, including the biological mother, adoptive parents, adoption agency, and the courts, receive adequate notice of the father's intent to assert his paternal rights. One requirement is that a putative father provide reasonable and consistent payments for the support of the biological mother or minor child before, at the latest, the date the adoption petition is filed. Thus, by imposing objective criteria to be met by a deadline consistent with the needs of a newborn child, the statute achieves its overall purpose of providing a final and uninterrupted placement for the child.
It is undisputed that respondent had the burden of proof to establish his compliance *809 with the statutory requirements. Even assuming, without deciding, that respondent's method of placing funds subjectively intended for the minor child in a special location in his home constitutes a statutory "payment," respondent nonetheless failed to prove that such payments met the other statutory criteria. As a matter of law, respondent's evidence was insufficient to establish that he made such payments before the statutory deadline or that each payment was reasonable and consistent in accord with his financial means during the statutory time frame.
In a trial without a jury, a trial court's findings of fact "are conclusive on appeal if there is competent evidence to support them," though "[f]indings not supported by competent evidence are not conclusive and will be set aside on appeal." In re Estate of Skinner , 370 N.C. 126, 139, 804 S.E.2d 449, 457-58 (2017) (alteration in original) (first quoting Bailey v. State , 348 N.C. 130, 146, 500 S.E.2d 54, 63 (1998) ; and then quoting Penland v. Bird Coal Co. , 246 N.C. 26, 30, 97 S.E.2d 432, 436 (1957) ). "Conclusions of law drawn by the trial court from its findings of fact are reviewable de novo on appeal." In re Foreclosure of Bass , 366 N.C. 464, 467, 738 S.E.2d 173, 175 (2013) (quoting Carolina Power & Light Co. v. City of Asheville , 358 N.C. 512, 517, 597 S.E.2d 717, 721 (2004) ).
"In distinguishing between findings of fact and conclusions of law, '[a]s a general rule, ... any determination requiring the exercise of judgment or the application of legal principles is more properly classified a conclusion of law.' " State v. Sparks , 362 N.C. 181, 185, 657 S.E.2d 655, 658 (2008) (alterations in original) (quoting In re Helms, 127 N.C. App. 505, 510, 491 S.E.2d 672, 675 (1997) (internal citations omitted) ). "[F]indings of fact [which] are essentially conclusions of law ... will be treated as such on appeal." Sparks , 362 N.C. at 185, 657 S.E.2d at 658 (second and third alterations in original) (quoting Harris v. Harris, 51 N.C. App. 103, 107, 275 S.E.2d 273, 276, disc. rev. denied, 303 N.C. 180, 280 S.E.2d 452 (1981) ). Moreover, determining whether sufficient evidence supports a judgment is a conclusion of law and will be reviewed as such. See Styers v. Phillips , 277 N.C. 460, 464, 178 S.E.2d 583, 586 (1971) ("Whether there is enough evidence to support a material issue is always a question of law for the court."); Rountree v. Fountain , 203 N.C. 381, 382, 166 S.E. 329, 330 (1932) ("Whether there is enough evidence to support a material issue is a matter of law.").
Chapter 48 of our General Statutes, governing adoption procedures in North Carolina, seeks
to establish a clear judicial process for adoptions, to promote the integrity and finality of adoptions, to encourage prompt, conclusive disposition of adoption proceedings, and to structure services to adopted children, biological parents, and adoptive parents that will provide for the needs and protect the interests of all parties to an adoption, particularly adopted minors.
N.C.G.S. § 48-1-100(a) (2017). Relevant here, section 48-3-601 requires a man who "may or may not be the biological father" to consent to the adoption of the child if he
4. Before the ... filing of the petition ... has acknowledged his paternity of the minor and
....
II. Has provided , in accordance with his financial means, reasonable and consistent payments for the support of the biological mother during or after the term of pregnancy, or the support of the minor , or both, which may include the payment of medical expenses, living expenses, or other tangible means of support, and has regularly visited or communicated, or attempted to visit or communicate with the biological mother during or after the term of pregnancy, or with the minor, or with both....
Id. § 48-3-601(2)(b)(4)(II) (2017) (emphases added). Thus, based on the statutorily prescribed test, the putative father has the burden of proof to show, by the earlier date of a prebirth hearing or the adoption petition's filing, in addition to the other statutory requirements, that: (1) he provided payments for the support of the biological mother, minor child, or both; (2) such payments were *810 reasonable in light of his financial means; and (3) such payments were made consistently.
A putative father must present competent evidence showing he complied with each requirement of the statute. If he presents competent evidence that he met some but not all of the statutory requirements, his consent to the adoption is not required.[1] To protect his rights under the objective statutory test, a putative father must fulfill all statutory requirements no later than the filing of the adoption petition. Id. § 48-3-601(2)(b)(4) (2017). Any evidence of actions occurring after the adoption petition is filed is irrelevant, and a trial court errs as a matter of law in considering such evidence. See In re Adoption of Byrd , 354 N.C. 188, 197-98, 552 S.E.2d 142, 148-49 (2001).
Among the statute's support requirements, first a putative father must present evidence that he has made "payments for the support of the biological mother ... or ... the minor, or both." N.C.G.S. § 48-3-601(2)(b)(4)(II). Thus, a putative father must show he has provided real, tangible support through an adequate payment method. See In re Byrd , 354 N.C. at 196, 552 S.E.2d at 148 ; see also Payment, Black's Law Dictionary (10th ed. 2014) (defining payment as "[p]erformance of an obligation by the delivery of money or some other valuable thing accepted in partial or full discharge of the obligation"). Importantly, a putative father may unilaterally protect his rights, in that the "legislature's deliberate use of 'for' rather than 'to' suggests the payments contemplated by the [support provision] need not always go directly to the mother. So long as the father makes reasonable and consistent payments for the support of mother or child, the mother's refusal to accept assistance cannot defeat his paternal interest." In re Anderson , 360 N.C. at 279, 624 S.E.2d at 630.
Second, a putative father must present evidence that, during the relevant time period, he has made reasonable payments for the support of the biological mother, minor child, or both. Id. § 48-3-601(2)(b)(4)(II) ; see Reasonable , Black's Law Dictionary (10th ed. 2014) (defining reasonable as "[f]air, proper, or moderate under the circumstances"). A reasonable payment is calculated based upon the earnings or financial resources of the putative father before the date of the adoption petition's filing.
Third, the statute requires that the putative father demonstrate he has made consistent payments. N.C.G.S. § 48-3-601(2)(b)(4)(II). To establish that his payments are consistent under the statute, the putative father must present an objectively verifiable record showing that he consistently made reasonable payments before the statutory deadline. See The American Heritage Dictionary 313 (2d coll. ed. 1985) (defining "consistent" as "[c]onforming to the same principles or course of action; uniform"); see also In re Anderson , 360 N.C. at 279, 624 S.E.2d at 631 (noting that, if the respondent had opened a bank account or established a trust fund, the biological mother's "intransigence would not have prevented him from creating a payment record through regular deposits into the account or trust fund in accordance with his financial resources" (emphasis added) ).
Our cases recognize these express statutory requirements, as well as the need for a precise payment record to demonstrate that a putative father consistently made reasonable payments before the statutory deadline. In In re Byrd the respondent father delivered a $100 money order and baby clothes to a third party for the benefit of the biological mother and child, but the biological mother did not receive the items until after the adoption petition had been filed. 354 N.C. at 191, 552 S.E.2d at 145. The Court recognized that, as evident from the statutory requirements, "[t]he interests of the child and all other parties are best served by an objective test." Id. at 198, 552 S.E.2d at 149. Thus, the Court determined that " 'support' is best understood *811 within the context of the statute as actual, real and tangible support, and ... attempts or offers of support do not suffice." Id. at 196, 552 S.E.2d at 148. Moreover, noting the importance of the statutorily imposed deadline, the Court acknowledged that "the statute is clear in its requirements, and respondent must have satisfied the ... prerequisites ... prior to the filing of the adoption petition." Id. at 194, 552 S.E.2d at 146. The Court concluded that the respondent need not consent to the adoption proceeding because "the money order and clothes sent to [the biological mother] by respondent ... arrived too late, as the statute specifically provides for the relevant time period to end at the filing of the adoption petition." Id. at 197, 552 S.E.2d at 149.
In In re Anderson this Court emphasized the importance of a verifiable payment record to establish that a putative father made reasonable and consistent payments. There the respondent father presented evidence that he saved money and made various offers of support, including offers of cash to the expectant mother at school and an unsuccessful attempt to deliver an envelope containing $100 to her home. 360 N.C. at 273-74, 624 S.E.2d at 627-28. The respondent also hired an attorney who sent a letter to the expectant mother explicitly offering the respondent's financial support, indicating that the respondent had accumulated money to provide assistance to the mother and child. Id. at 274, 624 S.E.2d at 628. Despite the respondent's efforts, the Court concluded that, without an objectively verifiable, independent record showing that he had provided real, tangible support payments, the respondent could not establish that any alleged payments were "reasonable and consistent [as] required under the [statute]." Id. at 278, 624 S.E.2d at 630. The Court noted that
[h]ere, respondent could have supplied the requisite support any number of ways, such as opening a bank account or establishing a trust fund for the benefit of [the biological mother] or their child. Had he done so, [the biological mother's] intransigence would not have prevented him from creating a payment record through regular deposits into the account or trust fund in accordance with his financial resources . By doing nothing more than sporadically offering support to [the biological mother], respondent left the support prong of N.C.G.S. § 48-3-601 unsatisfied and himself without standing to obstruct the adoption of [the minor child].
Id. at 279, 624 S.E.2d at 630-31 (emphasis added) (citing N.C.G.S. § 48-3-601(2)(b)(4)(II) ).
Here respondent's evidence was insufficient as a matter of law to support the trial court's conclusion that respondent complied with the statutory support payment requirements. Assuming, without deciding, that respondent's actions constituted a "payment for the benefit of" the minor child, respondent failed to present any evidence that could show that, before the statutory deadline of 9 July 2013, he made reasonable and consistent payments. Respondent even admitted that any alleged deposits were not "an exact amount," and the lockbox contained "just whatever [he] could afford here and there." Respondent conceded that he did not "keep[ ] records [so he did not] really know" how much money he placed in the lockbox at any relevant time, instead, simply estimating the average amount of money he may have placed in the lockbox during a given month. Thus, respondent's evidence is insufficient as a matter of law to demonstrate that any payments were reasonable based on his income during the relevant statutory time frame.
Moreover, neither respondent's general bank statements nor the lump sum presented at trial in April 2014 provides an objectively verifiable record showing that he consistently made reasonable payments within the statutorily relevant time period. Because respondent presented no objectively verifiable, independent record to demonstrate his compliance with the statute, the trial court erred as a matter of law in concluding that respondent was required to consent to the adoption.
Significantly, at the hearing, respondent presented comingled financial evidence, which impaired the trial court's ability to identify only the statutorily relevant evidence, namely, that between 11 February *812 2013, when he was informed of the pregnancy, and 9 July 2013, when the petition was filed. By considering irrelevant evidence, for example, the lump sum of $3260 in the lockbox at the time of the hearing and respondent's earnings, bank records, and receipts spanning the years 2012 to 2014 as a whole, the trial court erred as a matter of law. The Court of Appeals compounded this fundamental error by affirming the trial court's order based on a deferential standard of review, which assumed that respondent's compliance with the statute constituted a purely factual matter, as opposed to a matter of law. That court likewise overlooked the trial court's error in failing to differentiate between relevant and irrelevant evidence in light of the statutory deadline.
The unusual facts of this case cannot overshadow respondent's failure to comply with the statutory requirements to establish his legal rights before the adoption petition was filed. Respondent received undisputed notice that Wood was twenty weeks pregnant with his child in February 2013 and even accompanied her to the first medical appointment which confirmed the timing of the pregnancy and likely date of delivery. Respondent knew Wood was married to another man in a different state, likely moving to that state, using her husband's insurance for medical care, acting in a deceptive and secretive manner, and denying respondent's requests for a paternity test. Given this knowledge, respondent should have recognized the pressing need to protect his paternal interest and acted accordingly. See Eubanks v. Eubanks , 273 N.C. 189, 197, 159 S.E.2d 562, 568 (1968) ("When a child is born in wedlock, the law presumes it to be legitimate.").
Respondent's evidence here failed to demonstrate through an objectively verifiable record that he made the statutorily required reasonable and consistent payments for the support of the minor child before the adoption petition was filed. Because respondent's evidence cannot show he complied with the objective statutory requirements, the adoption should proceed without his consent. Thus, the decision of the Court of Appeals is reversed and this case is remanded to that court for further remand to the trial court for proceedings consistent with this opinion.
REVERSED AND REMANDED.

This case did not involve a prebirth hearing under section 48-2-206. Given the facts of this case, this opinion will refer to the relevant deadline as the date the adoption petition was filed. In a case involving a prebirth hearing, however, the statute recognizes the deadline as "the earlier of the filing of the petition or the date of a hearing under G.S. 48-2-206." N.C.G.S. § 48-3-601(2)(b)(4) (2017). Furthermore, the statutory requirements of acknowledgement of paternity and visiting or communicating, or attempting to do so, are not at issue in this appeal.